## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

---

CADDY PRODUCTS, INC.,                                Civil No. 05-800 (JRT/FLN)

                                    Plaintiff,

                                                **MEMORANDUM OPINION AND**
v.                                              **ORDER ON CROSS-MOTIONS FOR**
                                                    **SUMMARY JUDGMENT**

AMERICAN SEATING COMPANY,

                                    Defendant.

---

Richard G. Jensen and Dyanna L. Street, **FABYANSKE WESTRA HART & THOMSON, P.A.**, 800 LaSalle Avenue, Suite 1900, Minneapolis, MN 55402; Deirdre M. Kvale, Peter J. Ims, and Z. Peter Sawicki, **WESTMAN CHAMPLIN & KELLY, PA**, 900 Second Avenue South, Suite 1400, Minneapolis, MN 55402-3319, for plaintiff.

Conrad J. Clark, **CLARK & BRODY**, 1090 Vermont Avenue N.W., Suite 250, Washington, DC 20005; Michael D. O'Neill, **JOHNSON PROVO-PETERSEN O'NEILL, LLP**, 332 Minnesota Street, Suite W-975, St. Paul, MN 55101; Todd R. Dickinson, **FISHER & DICKINSON P.C.**, 4764 East Fulton, Suite 204, Ada, MI 49301, for defendant.

Plaintiff Caddy Products, Inc. ("Caddy") and defendant American Seating Company ("ASC") manufacture products and accessories for public seating in theatres and stadiums. Caddy brought this patent infringement action against ASC, alleging that stadium seat cupholders manufactured by ASC infringe the '638, '103, and Reissue patents assigned to Caddy. The parties now bring separate motions seeking summary judgment on issues of infringement and the validity of the '638 and Reissue patents.

## BACKGROUND

Caddy manufactures a variety of products and accessories for public seating in theatres and stadiums, including cupholders that attach to the back of stadium seats. Caddy owns several patents related to stadium seat cupholders. Caddy's U.S. Patent No. 5,421,638 (the "'638 patent"), entitled "Seat Attachment," describes a cupholder and an attachment mechanism for attaching the cupholder to a stadium seat through the use of mounting brackets. Caddy's U.S. Patent No. RE39,392 (the "Reissue patent"), entitled "Locking Bracket and Cupholder for Seat Frame," describes with greater specificity both the mounting brackets that attach to a particular style of seat standard and the cupholder that attaches to the bracket.[1]

The '638 patent comprises a container holder that is attached to a stadium seat "standard" through the use of mounting brackets. The seat standard is the vertical portion of a stadium seat that supports the seat back and attaches the seat to the floor. The cupholder also has a "retainer," which attaches to portions of the seat standard, attaches to the container holder, and holds the container holder in place. A preferred embodiment in the '638 patent depicts a cupholder that includes two mounting brackets, with one bracket extending above the container holder and one extending below the container holder.

Defendant ASC also manufactures various seating products for use in buses, offices, and stadiums, including stadium seats and stadium seat cupholders. ASC

---

[1] Caddy also asserted infringement of Caddy's U.S. Patent No. 5,628,103 (the "'103 patent"), which describes methods for attaching cupholders to seat standards. The parties have since stipulated to the dismissal of Caddy's claims relating to the '103 patent.

purchases a portion of its stadium seat cupholders from Caddy for use with ASC-manufactured stadium seats.  ASC has also developed and manufactured its own stadium seat cupholder, which is the subject of this infringement action.  ASC's cupholder consists generally of a container holder and a "stadium chair adapter," which includes a single mounting bracket located behind the container holder.  The adapter is the mechanism for attaching the cupholder to a seat standard.

Caddy filed this action against ASC in April 2005, alleging that ASC infringed Caddy's '638 patent and Reissue patent.  On April 4, 2008, the Court issued a Memorandum Opinion and Order construing the claim terms in the allegedly infringed patents.  Both parties now move for summary judgment.  ASC seeks a ruling of non-infringement of both patents under literal infringement or doctrine of equivalents theories.  In the alternative, ASC moves for judgment as a matter of law that the '638 and Reissue patents are invalid based on their obviousness in light of prior art.  Caddy's motion seeks summary judgment that the '638 patent is valid, that ASC has infringed Claim 13 of the '638 patent literally or under the doctrine of equivalents, and that the Reissue patent is valid despite ASC's challenge that the patent fails to name a proper inventor.

## DISCUSSION

## I.     STANDARD OF REVIEW

Summary judgment is appropriate where there are no genuine issues of material fact and the moving party can demonstrate that it is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  A fact is material if it might affect the outcome of the suit,

and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that can be drawn from those facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). When reviewing motions for summary judgment on infringement or invalidity, the Court must determine whether there is a genuine evidentiary dispute such that "a jury could decide the issue either way." *Motionless Keyboard Co. v. Microsoft Corp.*, 486 F.3d 1376, 1379-80 (Fed. Cir. 2007).

## II.    THE '638 PATENT

### A.    Cross-Motions for Summary Judgment on Non-infringement and Infringement

The Court begins by addressing the summary judgment motions regarding infringement of the '638 patent under literal infringement or doctrine of equivalents theories. The parties' dispute focuses solely on Claim 13, which recites

> A seat attachment in combination with a seat standard, the seat standard being attachable to a support surface and being generally upright and having at least one upper seat bracket extending laterally therefrom to opposite sides of the standard for supporting separated seat backs for a pair of adjacent seats forwardly of the seat bracket, the seat attachment comprising:
>
> a container holder having a generally open upwardly facing first end;
>
> a mounting bracket attached to the container holder and having an upper end spaced from the first end of the container holder and having means for mounting the mounting brackets to the upper seat bracket to support the container holder behind the seat bracket; and

a retainer attached to the container holder and attached to portions of the standard for holding the container holder in substantially fixed relation to the standard.

(Def.'s Supp. Mem., Docket No. 148, Ex. B.)

Specifically, the parties dispute whether the accused product falls within the scope of the "retainer" limitation in Claim 13. ASC asserts that the accused product fails as a matter of law to meet each and every limitation of Claim 13 because the ASC cupholder lacks a retainer. Further, ASC contends that there is no dispute of fact that the ASC cupholder has no equivalent element to the retainer limitation, and that ASC is entitled to summary judgment of non-infringement under the doctrine of equivalents. Caddy counters that the ASC cupholder has a retainer as a matter of law, and that it is therefore entitled to summary judgment of infringement of the '638 patent.

### 1.       Literal infringement of the '638 Patent

"The determination of whether a patent claim has been literally infringed involves two inquiries: whether the claims have been properly interpreted to determine their scope, and whether each limitation of the properly construed claims is found in the accused product or process." *Hormone Research Found., Inc. v. Genentech, Inc.*, 904 F.2d 1558, 1562 (Fed. Cir. 1990); *see also Lantech, Inc. v. Keip Mach. Co.*, 32 F.3d 542, 547 (Fed. Cir. 1994) ("Literal infringement is found where the accused device falls within the scope of the asserted claims as properly interpreted."). In evaluating whether the product literally infringes, "each limitation of the claim must be met by the accused device exactly, [with] any deviation from the claim precluding a finding of infringement." *Lantech*, 32 F.3d at 547.

ASC's cupholder must have a retainer element to fall within the scope of Claim 13. According to Claim 13, the retainer element is part of a seat attachment that 1) is attached to the seat standard, 2) is attached to portions of the container holder, and 3) holds the container holder in substantially fixed relation to the seat standard. (*See* '638 Patent, Docket No. 151, Ex. A.)[2]

### a. "Holding the container holder in substantially fixed relation to the seat standard"

ASC contends that because the structure of the ASC cupholder does not *require* a retainer to prevent lateral or rotational movement of the cupholder (i.e., to hold the container holder in substantially fixed relation to the seat standard), the accused product does not *have* a retainer. ASC relies on the expert testimony of Dr. Susan Mantell to support this argument. Although the Court finds it somewhat problematic that ASC offers Dr. Mantell's expert report as evidence in the context of literal infringement, as opposed to doctrine of equivalents theory for which Dr. Mantell was retained, Dr. Mantell's engineering analysis does provide evidence that the accused product may not have a retainer.[3]

---

[2] The Court construed a retainer as a "portion that holds something." *Caddy Prods., Inc. v. Am. Seating Co.*, No. 05-800, 2008 WL 927569, *4 (D. Minn. Apr. 4, 2008).

[3] Dr. Mantell's opinion is relevant to the summary judgment motions relating to literal infringement because it describes the function of the retainer in Claim 13 and then notes that ASC's cupholder does not require a similar element to achieve a similar function because it is constructed differently. Dr. Mantell's opinion, however, relies on a "functionality" standard from *Warner-Jenkinson Co., Inc. v. Hilton Davis Chem. Co.*, which is a doctrine of equivalents standard. 520 U.S. 17, 40 (1997) ("An analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute element

(Footnote continued on next page.)

The Court first notes a problem with Dr. Mantell's report.  Dr. Mantell states:

> The '638 patent describes a seat attachment that is mounted on a seat standard and is comprised of a cupholder and several features used to secure the attachment to the seat standard.  **These features include two flexible arms with mounting brackets located at the end of each arm.**

(Docket No. 148, Ex. G at 1 (emphasis added).)  This passage refers first to language in Claim 13 and then, perhaps unintentionally, describes the characteristics of a *preferred embodiment* described in the '638 patent.  The preferred embodiment, however, is not the proper source of comparison in an infringement action; rather, the accused product should only be compared to the patent claims.  *See Rexnord Corp. v. Laitram Corp.*, 274 F.3d 1336, 1344 (Fed. Cir. 2001) ("Our case law is clear that an applicant is not required to describe in the specification every conceivable and possible future embodiment of his invention.").  Indeed, Claim 13 does not provide a limitation of two mounting brackets or two flexible arms.  Further, this Court has already held that "[t]he fact that the preferred embodiment depicts two separate supports cannot be used to limit the ordinary meaning of the claim terms."  *Caddy*, 2008 WL 927569, at *3 (citing *Johnson Worldwide Assocs., v. Zebco Corp.*, 175 F.3d 985, 990 (Fed. Cir. 1999)).   In short, Dr. Mantell has not offered an opinion on literal infringement.  Nevertheless, as set forth in the analysis of the

_____

(Footnote continued.)

plays a role substantially different from the claimed element.")  The Court recognizes that it would be impossible for a product to literally infringe a patent but not infringe under the doctrine of equivalents, but the inverse is not true.  *Cf. Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1218 (Fed. Cir. 1995) ("When literal infringement is not established, infringement may be proved under the doctrine of equivalents when there is not a substantial difference between the claimed invention and the accused product.").  Thus, providing expert analysis in the context of a doctrine of equivalents standard is not sufficiently probative in a question of literal infringement to conclude that as a matter of law there is no literal infringement.

parties' doctrine of equivalents claims, Dr. Mantell's report presents a factual basis for the proposition that a retainer is not present in the accused product.[4]

Caddy argues that ASC's adapter serves as both a mounting bracket and a retainer as those terms are defined in Claim 13. (Pl.'s Supp. Memo., Docket No. 145 at 14.) That is, Caddy argues that the "wing" structure on the adapter is the mounting bracket and the remainder of the adapter comprises the retainer. Caddy then argues that the adapter holds the container holder in substantially fixed relation to the seat standard:

> The bolts passing through the mounting bracket and into the seat standard lug fixes the ASC adapter in place against the seat standard. Because they are integrated parts, that attachment necessarily also fixes the retainer relative to the seat standard. When the cupholder is assembled to the adapter, the connection tab on the retainer snaps into the corresponding slot on the cupholder, locking it into place. The retainer thus holds the cupholder to the seat standard.

(*Id.* (citation omitted).)

ASC responds that Caddy is attempting to "double count" the "supporting" limitation[5] of the mounting bracket and the "holding" limitation[6] of the retainer in Claim 13. As a result, ASC argues that the retainer limitation is rendered meaningless by Caddy's proposed conclusion. Moreover, ASC argues that Caddy failed to provide

---

[4] The Court considers the report for the purpose of deciding these motions, and notes that the report's deficiencies, if any, may be addressed before trial.

[5] This limitation recites "a mounting bracket attached to the container holder and . . . having means for mounting the mounting brackets to the upper seat bracket to **support the container holder behind the seat bracket**." ('638 Patent, Docket No. 151, Ex. A (emphasis added).)

[6] This limitation teaches "a retainer attached to the container holder and attached to portions of the standard for **holding the container holder in substantially fixed relation to the standard**." ('638 Patent, Docket No. 151, Ex. A (emphasis added).)

evidence that Caddy's interpretation of the retainer in the ASC cupholder holds the ASC container holder in substantially fixed relation to the seat standard, as opposed to merely attaching the two elements.  (Def.'s Opp. Memo., Docket No. 159 at 5.)  In sum, ASC argues that the mere fact that the ASC adapter is attached to the seat standard fails to establish that any component of the adapter is, in fact, a retainer.  (*Id.* at 7.)

The Court is not persuaded that Caddy's literal infringement analysis renders the retainer limitation meaningless, but such analysis may demonstrate a factual dispute that should be resolved by the jury.

### b.  "Attached to the seat standard"

In its previous Order, the Court construed the term "attached" to mean "connected to."  *Caddy Prods., Inc. v. Am. Seating Co.*, No. 05-800, 2008 WL 927569, at *5 (D. Minn. Apr. 4, 2008).  The parties do not dispute that the adapter is attached to the container holder in the accused product.

Caddy further argues, however, that the alleged "retainer" portion of ASC's adapter is attached to the *seat standard* in two ways.  Caddy first argues that the alleged retainer section of the adapter is connected directly to the seat standard via the flat face that fits against the surface of the seat standard and that transects the mounting "wings." (Pl.'s Supp. Mem., Docket No. 145 at 14-15.)  Second, Caddy argues that the alleged retainer section of the adapter is attached to the standard indirectly, via the mounting bracket portion of the adapter.  (*Id.*)  Caddy supports its indirect attachment argument with the proposition that the attachment between the retainer and the seat standard need not be direct, but can be through an intermediate structure.  *See Royal Typewriter Co. v.*

*Remington Rand*,   168 F.2d 691, 693 (2d Cir. 1948) ("We speak of two objects as 'attached' to each other, though they are connected by a train of links or even by a chain."). Thus, Caddy argues that the ASC cupholder attaches to the seat standard, albeit indirectly through the seat bracket and mounting bolts.

ASC responds that it is "clear" from deposition testimony that the only attachment of the cupholder to the seat standard in the accused product is through mounting bolts and mounting brackets.   But ASC's own representative, when asked about the potential attachment of the ASC adapter to the seat standard, equivocated:

> Q  [Caddy]: And the shape of this adapter with this flat portion in the back that connects here to the back of the standard, that shape provides some stability for the adapter; is that correct?

> A:  [Representative Thomas Kemppainen] **I don't know that it provides any stability for the adapter**.   It just – it's – the reason its flat is because the core box that you use to make the holes in the back of this has this shape to it. . . .

> Q:  But if – but if it didn't fit into the back of the part, it would not be stable, would it?

> A:  If it didn't – if it didn't have that shape, **I think the biggest problem would be that your bolts – when they go through it, you wouldn't have a flat surface for your bolts to screw into, because your bolts are coming through the backs at an angle**.   And by having this be also at the same angle, then your bolts can come straight through and catch the back of this cup holder.   That's the – that's the reason why they sit like that.

(Kemppainen Dep. 19:22-21:2, Docket No. 151, Ex. F (emphasis added).)

When asked whether the flat portion of the adapter that synchs with the seat standard could have been left out of the design, Kempainnen responded:

> Not in the way that we made the part, no. . . . It really doesn't matter because we're really not getting anything out of that surface.   What we're – we're only getting our attachment by screwing in the bolts.   We're not

really gaining anything from that surface, which is why we are accepting parts with that divot in it, because it really isn't adding anything to us to do it.

(*Id.* 20:18 to 21:20.)

The Court concludes that the issue of whether every limitation in Claim 13 is met in the accused product is a question of fact. *See Genentech*, 904 F.2d at 1562. Indeed, the very substance of the parties' arguments comparing the ASC cupholder to the '638 patent claim language illustrates the presence of a genuine factual dispute about whether the ASC design has a retainer.

Accordingly, the Court denies ASC's and Caddy's motions as to literal infringement or non-infringement of the '638 patent.

### 2.   Infringement of the '638 Patent under the doctrine of equivalents

A patent may be infringed under the doctrine of equivalents "in situations where there is no literal infringement but liability is nevertheless appropriate to prevent what is in essence a pirating of the patentee's invention." *Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 870 (Fed. Cir. 1985), *overruled on other grounds*, *Nobelpharma AB v. Implant Innovations, Inc.*, 141 F.3d 1059 (Fed. Cir. 1998). Under the doctrine of equivalents, an accused product will be found to infringe a claim "if it performs substantially the same function in substantially the same way to obtain the same result." *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.*, 339 U.S. 605, 608 (1950) (quoting *Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 42 (1929)) (internal quotation marks omitted). "[N]on-

infringement under the reverse doctrine of equivalents is a question of fact." *Roche Palo Alto LLC v. Apotex, Inc.*, 531 F.3d 1372, 1377 (Fed. Cir. 2008).

> Under the doctrine of equivalents, the patentee has an evidentiary burden:

> > Pursuant to our precedent, **a patentee must . . . provide particularized testimony and linking argument** as to the 'insubstantiality of the differences' between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents. **Such evidence must be presented on a limitation-by-limitation basis**. Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.

*AquaTex Indus., Inc. v. Techniche Solutions*, 479 F.3d 1320, 1329 (Fed. Cir. 2007) (citing *Tex. Instruments, Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1567 (Fed. Cir. 1996)) (emphasis original).

Caddy argues that the ASC adapter infringes Claim 13 under the doctrine of equivalents because the adapter has substantially the same function and achieves the same results, in substantially the same way as the retainer. Further, despite what could be characterized as a condensed version of the retainer and mounting bracket in the ASC adapter, Caddy notes that the Federal Circuit has held that "[t]he doctrine of equivalents does not require a one-to-one correspondence between components of the accused device and the claimed invention." *Dolly, Inc. v. Spalding & Evenflo Co.*, 16 F.3d 394, 398 (Fed. Cir. 1994) (citing *Intel Corp. v. Int'l Trade Comm'n*, 946 F.2d 821, 832 (Fed. Cir. 1991). Instead, "[a]n accused device may infringe under the doctrine of equivalents even though a combination of its components performs a function performed by a single element in the patented invention." *Id.*

ASC responds that Caddy has failed to satisfy its evidentiary burden under *AquaTex* to provide particularized testimony, on a limitation-by-limitation basis, showing that the ASC adapter is equivalent to the retainer recited in Claim 13 of the '638 patent. Rather, ASC contends that Caddy has produced only "lawyer argument" and "generalized testimony." Caddy points to the declaration of Peter Bergin, Caddy's representative, to demonstrate that it has produced particularized testimony with respect to the function-way-result test and infringement of Claim 13. After examining the retainer and mounting bracket as taught in Claim 13, Bergin provides the following analysis:

> I have compared ASC's cupholder assembly to Claim 13. The cupholder and "adapter" assembly contain structure that correspond closely to the retainer and bracket of Claim 13, and that have the same purpose and accomplish each of the same results in substantially the same way as the retainer and the bracket set forth above. I have identified the structure of the ASC cupholder and adapter assembly on the attached Exhibit A.

(Bergin Decl., Docket No. 158, ¶ 11.)

"Both the Supreme Court and [the Federal Circuit] have made clear that the evidence of equivalents must be from the perspective of someone skilled in the art." *AquaTex*, 479 F.3d at 1329. As the president of Caddy Products and after being involved with the cupholder seating industry since 1990, Bergin is well-qualified as someone skilled in the art. Even ASC's briefs suggest that someone skilled in this art need not have "a formal education in engineering or mechanical engineering, but would have a mechanical aptitude, be curious as to how things work and are assembled, and would have experience with assembling simple mechanical devices." (Def.'s Supp. Mem., Docket No. 148 at 29 (describing the level of skill in art in the context of a patent validity discussion)).

Moreover, although Bergin's testimony does not address every limitation in Claim 13, it addresses the limitation that is at issue.  Additionally, instead of merely reviewing the accused product, Bergin compares the ASC adapter to the '638 patent and incorporates the function-way-result test in his analysis.  *Cf. AquaTex*, 473 F.3d at 1329 ("[CEO Doug] Frost's testimony only explained how the defendant's product operated.  It did not specifically address equivalents or compare [the accused] product to the patented method on a limitation-by-limitation basis."); *Lear Siegler v. Sealy Mattress Co.*, 873 F.2d 1422, 1426 (Fed. Cir. 1989) (holding that the question of infringement under the doctrine of equivalents was improperly submitted to the jury, in part because "[i]t is clear that LSI did not elicit testimony explicitly comparing the claimed and accused devices as to all three elements of equivalence").

The Court acknowledges that Caddy presents considerable "lawyer argument" in its briefing about the presence of an equivalent retainer in the ASC adapter.  *See AquaTex*, 473 F.3d at 1329 ("In short, in opposing summary judgment, AquaTex only provided lawyer argument and generalized testimony about the accused product. It has failed to demonstrate a genuine issue of material fact that would prevent the grant of summary judgment.").  In considering the parties' arguments, however, the Court disregarded any analysis that was not based on actual evidence in the record.  Although the Bergin declaration is not overwhelming and it is plainly insufficient to meet Caddy's burden for summary judgment, Caddy has at least met the *AquaTex* evidentiary burden to proceed to a jury on a theory of equivalency.  Accordingly, the Court denies Caddy's and

ASC's motions for summary judgment of infringement or non-infringement of the '638 patent under the doctrine of equivalents.

ASC also briefly contends that Caddy is estopped by prosecution history from asserting infringement under the doctrine of equivalents.   As a policy limitation, "prosecution history estoppel will not allow the patentee to recapture through equivalence certain coverage given up during prosecution."  *Loctite*, 781 F.2d at 870.  "Under this doctrine, the surrender of subject matter during patent prosecution creates a presumption that the patentee is precluded from recapturing that subject matter through the doctrine of equivalents; this presumption can be rebutted by the patentee through a showing that an amendment was unrelated to patentability."  *AquaTex*, 473 F.3d at 1325.  Thus, when the doctrine of equivalents is invoked, there must be an examination not only of **what** was surrendered, but also **why** it was surrendered.  *Loctite,* 781 F.2d at 871.

The '638 patent prosecution history reflects several amendments to the language of Claim 13, and ASC argues that those amendments preclude the application of the doctrine of equivalents.  "[T]he patentee bears the burden of proving that an amendment was not made for a reason that would give rise to estoppel," and "the patentee should [also] bear the burden of showing that the amendment does not surrender the particular equivalent in question."  *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 740 (2002).  ASC offered no argument at the hearing or in its motion briefs for their bare assertion that prosecution history estoppel bars Caddy from claiming infringement of the retainer element under the doctrine of equivalents.  Caddy, on the other hand, seeks to meet its *Festo* burden by responding that the substantive changes to the retainer

limitation language were designed merely to clarify the term "guide means," which was used in earlier language in the patent application. Caddy further contends that aside from clarification, later amendments were for "cosmetic" purposes only or even **broadened** the claim element. After reviewing the prosecution history, the Court finds that the amendments to limitation language were not related to patentability and prosecution history estoppel does not bar Caddy from pursuing its doctrine of equivalents theory.

### B.      Validity of the '638 Patent

If the Court were to determine as a matter of law that Claim 13 of the '638 patent reads on the ASC cupholder, ASC argues that it is entitled to summary judgment that the '638 patent is invalid for obviousness. *See* 35 U.S.C. § 103. Caddy argues that the '638 patent is not obvious and requests in its own motion that the Court conclude as a matter of law that the '638 patent is not invalid under § 103 of the Patent Act.

A patent is presumed valid, 35 U.S.C. § 282, and the party asserting invalidity has the burden of establishing, by clear and convincing evidence, that a patent is invalid. *See, e.g.*, *Smiths Indus. Med. Sys., Inc. v. Vital Signs, Inc.*, 183 F.3d 1347, 1356 (Fed. Cir. 1999). Title 35 of the United States Code, Section 103 "forbids the issuance of a patent when 'the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *KSR Int'l Co. v. Teleflex Inc.*, 127 S. Ct. 1727, 1734 (2007) (quoting 35 U.S.C. § 103). Whether a claimed invention is obvious under § 103 is a legal conclusion that depends on underlying factual findings. *Richardson-Vicks Inc. v. Upjohn*

*Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997).   The Supreme Court has outlined which

factual findings are relevant to the obviousness consideration:

> Under § 103, the scope and content of the prior art are to be determined;
> differences between the prior art and the claims at issue are to be
> ascertained; and the level of ordinary skill in the pertinent art resolved.
> Against this background, the obviousness or nonobviousness of the subject
> matter is determined.   Such secondary considerations as commercial
> success, long felt but unsolved needs, failure of others, etc., might be
> utilized to give light to the circumstances surrounding the origin of the
> subject matter sought to be patented.

*Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966).

### 1.   The scope and content of the prior art and the differences between the prior art and Claim 13 of the '638 Patent

ASC points to three items that define the scope of the prior art in the context of

this invalidity challenge: the American Seating stadium seat, U.S. Design Patent 307,852

("Clark"), and United States Patent 4,063,701 ("Wray").   First, ASC cites the American

Seating stadium seat for the proposition that the ASC seat with a seat standard and seat

bracket was known at the time of the invention of the '638 patent.   Second, ASC notes

that Clark – which teaches a cupholder with a container holder that attaches directly to

the back of a stadium seat by drilling holes into the seat – demonstrates that at the time of

the invention of the '638 patent it was known to attach cupholders to stadium seats.

Third, ASC introduces Wray – which teaches a cupholder that attaches to the leg of a

lawn chair, without drilling holes – for the argument that at the time of the invention of

the '638 patent, it was known to mount cup holders to "seat standards" without drilling

holes.   As a result, ASC contends that the only difference between the prior art and

Claim 13 "is that claim 13 requires the mounting bracket to be attached to the upper seat

bracket of the American Seating stadium seat." (Def.'s Supp. Mem., Docket No. 148 at 29.)

Clark, however, was before the patent examiner during prosecution of the '638 patent, and its scope and content were considered in the determination of the apparatus's patentability. Further, the American Seating stadium seat was referenced in figures 1 and 2 of the '638 patent, and although it is not listed as a cited reference, the patent examiner would have had an opportunity to consider the scope of the seat. To the extent that Wray constitutes a "building block" of the '638 patent, it remains disputed whether the attachment through mounting brackets on the cupholder to the seat brackets behind the American Seating stadium seats would be obvious in light of a cupholder that is attached to a lawn chair. Recognizing that this is a factual dispute, however, the Court deems the scope and content of the prior art to be disputed, and thus summary adjudication of obviousness is inappropriate.

### 2.    The ordinary level of skill in the art

ASC's technical expert, Dr. Mantell, determined that the person of ordinary skill in the art "would not necessarily be required to have a formal education in engineering or mechanical engineering." (Docket No. 151, Ex. P. at 2.) Rather, Dr. Mantell concluded that a person with an ordinary level of skill in the art[7] would merely have a "mechanical aptitude" (they would be curious about how things work or are assembled) and would

---

[7] Dr. Mantell defines the art as "the subject of fastening components together where one component is a bracket and the other is some object that serves a function." (Docket No. 151, Ex. P. at 2.)

have "experience with assembly." (*Id.*) Caddy's expert, Marshall Lacome, opines that a person of ordinary skill in the art[8] "is someone who works in, and has knowledge of, the seating industry and the corresponding cupholders that are used in the industry." (Docket No. 157, Ex. B. at 2.)

ASC attacks the source and the substance of Caddy's expert's opinion. First, ASC contends that Lacome is not qualified to provide expert opinion regarding a person of ordinary skill in the art because Lacome is "a salesman of seats and seating products," and thus "merely . . . an observer without particularized knowledge of the background or knowledge of the persons who design the products." (Def.'s Reply Mem., Docket No. 163 at 17.) Second, ASC argues that Lacome's assertion of what constitutes ordinary skill in the art does not create a genuine issue of material fact because Caddy does not distinguish between the qualities opined by Dr. Mantell and those opined by Lacome. (*Id.*)

ASC's challenge to Lacome's qualifications suggest only that Lacome has a different background than Dr. Mantell or other experts, and the Court is not persuaded that Lacome's opinion should be rejected. Having "experience with assembly" and having experience in the seating industry may well require different experiences. For example, Dr. Mantell notes that the experience and aptitude that she posits as the level of ordinary skill in the art "could include reloading batteries in a camera . . . or assembling plastic children's toys." (Docket No. 151, Ex. P at 2.) This is clearly broader than

---

[8] Mr. Lacome defines the art as "the seating industry, including the cupholders that attach to the seating." (Docket No. 157, Ex. B. at 2.)

Lacome's opinion that one with the ordinary level of skill in the art would have experience in the **seating industry**, and the factual resolution of the ordinary level of skill in the art remains disputed.

### 3.      Applicability of *KSR*

The Supreme Court held in *KSR* that a known problem in the prior art can be relevant to the obviousness inquiry:

> Where there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely the product not of innovation but of ordinary skill and common sense.

*KSR*, 127 S. Ct. at 1742.

ASC quotes the background section of the '638 patent, noting that drilling holes in a stadium seat was a known problem in the prior art that led to the development of the '638 patent: "[I]n mounting such [prior art] container holders, bolts are used which must be provided and which require the drilling of additional holes in the seat back."  U.S. Pat. No. '638, col. 1, lines 25-28.  ASC also contends that as a result of this recognition, the early design in Clark was "ready for improvement."  Moreover, ASC posits that Wray teaches a cupholder that could be mounted to a seat "standard" to make the cupholder readily accessible.  ASC concludes that the only question therefore is whether "one of skill in the art would find it obvious to mount the cup holder to the seat bracket of the American Seating seat standard."

Based on this analysis, ASC asserts that the *KSR* standard is satisfied because there were only two options, in light of prior art, to attach a cupholder to a stadium seat:

drilling holes in the seat to attach the cupholder or using holes that were already present in the seat back. Because these options were identified and predictable, ASC argues that the '638 patent was the result of common sense, not innovation.

"The mere application of a known technique to a piece of prior art ready for the improvement" precludes patentability. *Id.* at 1740. Caddy notes, however, that despite the use of cupholders in stadium seating applications for fifteen years before the introduction of its products covered by the '638 patent (or the Reissue patent), no one else developed a solution to a persistent problem of vandalism and theft of the cupholders. Summary judgment on obviousness for either party is inappropriate, as neither has demonstrated that the facts underlying the legal conclusion of obviousness are undisputed.[9]

### 4.    Caddy's further arguments in support of its motion

Caddy argues that it is entitled to judgment as a matter of law that the '638 patent is valid because ASC cannot overcome the clear and convincing evidentiary burden required to invalidate the '638 patent. Caddy reasons that ASC's 30(b)(6) witness, Keith McDowell, testified that he had no reason to believe that the '638 patent was invalid. Caddy attempts to further bolster this line of reasoning by pointing to the testimony of ASC's expert witness, Dr. Mantell, who testified that she had no opinion on the obviousness of the '638 patent. Although ASC has the burden of proving invalidity by

---

[9] Although the parties further discuss the presence or absence of objective indicia of nonobviousness, the factual disputes outlined above regarding *Graham* factual findings render further analysis unnecessary.

clear and convincing evidence, *see* 35 U.S.C. § 282, the Court is not persuaded by Caddy's argument.   Obviousness is a legal conclusion with factual underpinnings. *Richardson-Vicks Inc. v. Upjohn Co.*, 122 F.3d 1476, 1479 (Fed. Cir. 1997).   The failure of ASC's fact witnesses to render legal opinions as to invalidity in no way contradicts the factual considerations presented by ASC.   In sum, the factual disputes behind an obviousness determination remain.

## III.   THE REISSUE PATENT

### A.   Motion for Summary Judgment as to Non-infringement or Infringement

#### 1.   Infringement of Claim 15

##### a.   An inclined planar surface protruding outwardly from a planar base wall and a wedge shaped latch positioned to engage mating wedge shaped latch

Claim 15 of the Reissue patent recites a "mounting portion including a planar base wall having at least one wedge shaped latch having an inclined planar surface protruding outwardly from a plane surface of the planar base wall."   U.S. Pat. No. RE39,392 E, column 6, lines 4-7.   The Court previously construed a "planar base wall" to mean "a generally flat base wall," but concluded that the latter part of the claim limitation requires no further definition.   ASC argues that its cupholder does not infringe Claim 15 because the cupholder does not meet the limitation of an inclined planar surface protruding outwardly from the plane surface of the planar base wall.   Instead, ASC argues that the only features on its planar base wall are "sacrificial ribs" – which ensure a tight fit between the adapter and container holder when fastened together – and a hole for

receiving the tab from the adapter.  Caddy does not counter this argument by producing contrary evidence.  Accordingly the Court grants ASC's motion for summary judgment of non-infringement solely as to this limitation in Claim 15.

Claim 15 further recites a "wedge shaped latch positioned to engage a mating wedge shaped latch on a bracket on the seat standard."  ASC argues that because the wedge shaped element on its adapter only mates with a hole on the planar base wall, its product cannot infringe Claim 15.

By not addressing literal infringement of these limitations in its response or at the hearing, Caddy appears to concede that the ASC cupholder does not literally infringe these Claim 15 elements.  Caddy contends, however, that the ASC cupholder infringes Claim 15 under the doctrine of equivalents.  Caddy notes that the key function of the wedge shaped structure protruding from the planar base wall in Claim 15 is to engage the wedge shaped latch structure on the bracket attached to the seat standard.  As a result of this engagement, the latch structures prevent removal of the cupholder from the bracket "through simple vertical sliding of the parts."  (Pl.'s Opp. Mem., Docket No. 156 at 18.) Caddy asserts that the ASC cupholder's structure "accomplishes the same function and achieves the same result in substantially the same way by using a wedge shaped structure on the bracket and a corresponding recess in the base wall on the cupholder" to prevent removal of the container holder from the adapter through simple vertical sliding of parts. (*Id.*)  The difference between the mating wedge shaped latch structure recited in Claim 15 and the hole in the ASC cupholder, according to Caddy, is insubstantial.

The equivalence between the hole and the mating wedge shaped latch is a question of fact. The parties produced contradictory evidence indicating the presence or absence of such equivalent, and summary judgment is therefore inappropriate for either party. ASC again argues that Caddy failed to present "particularized testimony and linking argument on a limitation-by-limitation basis." *See AquaTex*, 479 F.3d at 1329. The Court finds, however, as it did in the review of infringement of the '638 patent, that the Bergin declaration satisfies the *AquaTex* burden. That is, in his declaration, Bergin reviews the functionality, means, and results of the latch structures as recited in Claim 15, and then provides a function-way-result analysis linking the ASC fastening structure to Claim 15's latch structure. (Bergin Decl., Docket No. 158, ¶¶ 12-13.)

ASC also claims that Caddy is estopped by prosecution history from asserting infringement of Claim 15 under the doctrine of equivalents. Even in light of the plaintiff's burden "of proving that an amendment was not made for a reason that would give rise to estoppel," and also of "showing that the amendment does not surrender the particular equivalent in question," *Festo*, 535 U.S. at 740, the Reissue patent prosecution history does not estop Caddy from alleging infringement under the doctrine of equivalents. ASC first raises the estoppel issue in its reply brief to Caddy's opposition memorandum, and Caddy did not have an opportunity to respond to the argument in briefing. Moreover, after a review of the record, including the parties' claim construction briefs and the Reissue patent's prosecution history, it at least appears that Caddy could produce sufficient evidence to prove it did not surrender its latch-hole equivalent claim.

The only amendment made in the prosecution history for the Reissue patent regarding the mating wedge shaped latch was the addition of the word "shaped" in "wedge shaped latch." (Pl.'s Markman Brief, Docket No. 70 at 22).   Although ASC would have a strong argument for prosecution history estoppel on the limitation of an "inclined planar surface protruding outwardly from a planar base wall," that limitation is no longer the subject of the infringement claims.   Thus, Caddy may proceed with its doctrine of equivalents theory for infringement as it relates to the mating wedge shaped latch.

### b.      A pair of spaced side shield walls

Claim 15 further requires the mounting portion of the cupholder to have "a pair of spaced side shield walls," but ASC argues that the accused product does not meet this limitation.  (Def.'s Supp. Mem., Docket No. 148 at 19.)  The Court construed "a pair of spaced side shield walls" to mean "two walls on the cupholder on opposite sides of the base wall that **shield bolts** used to attach the bracket to the seat standard."  *Caddy*, 2008 WL 927569, at *7 (emphasis added).   The Court construed the term "shield" to mean "obscure."  *Id.* at *12.

ASC produced testimony from its Vice President of Engineering, who noted that in the ASC design, the bolts are not shielded by any wall, although access to the bolts may be limited.  (Def.'s Supp. Memo., Docket No. 148 at 20.)  Further, ASC concludes that the bolts are also fully visible from the rear of the seat having the cupholder, as well as from the front of the seat.  (*Id.* at 21.)   In response, Caddy argues that the ASC cupholder has side shield walls and that those walls obscure **access** to the mounting bolts

from the front of the seat, even if they do not obscure the bolts' visibility. (Pl.'s Opp. Memo., Docket No. 156 at 17, Ex. A.).

In its Order construing claim terms, the Court found that "the shielding function of the side shield walls should be taken into account in construing that claim term," though the Court rejected any notion that the side shield walls had to "cover" the mounting bolts. *Caddy*, 2008 WL 927569, at \*7. Accounting for its shielding function, it is difficult to surmise that a rational trier of fact could find that the ASC cupholder has a pair of side shield walls. The mounting bolts, when used to fasten the ASC cupholder to a seat standard, are not shielded or obscured by **any** element in the ASC **container holder**. Viewing the cup holder from a worm's eye view, there may be evidence that the **adapter** obscures the view or accessibility to the mounting bolts, but the adapter element is not at issue here. When viewed from the top or the side, it is clear that the elements in the ASC design that Caddy argues are side shield walls do nothing to obscure or shield the view of the mounting bolts.

Moreover, the Court is not persuaded by Caddy's argument that the ASC cupholder has an element that obscures access to the mounting bolts. To attach the ASC cupholder to the seat, the bolts enter first through the seat back, and **then** through the mounting bracket on the ASC adapter. As a result, the only part of the bolt that is accessible, vis-à-vis the container holder, is the threading at the end of the bolt. Even then, access to the bolt would only be obscured by the alleged side shield walls if one were to address the bolts from directly in front of the cupholders; and even then, the container holder generally—not the alleged side shield walls—obscures access to the

mounting bolts.   Access to the bolt from the **top** of the cupholder is not obscured at all.

Indeed, Caddy conceded at the hearing that any remaining, visible portion of the bolts

would likely be broken off after the bolt fastened the cupholder to the seat standard.   A

rational trier of fact could not conclude that the ASC cupholder has side shield walls, and

the Court grants ASC's motion for summary judgment of non-infringement of Claim 15,

as it relates to the side shield walls element.

### 2.        Infringement of Claims 11, 16, 17, 20, 21, 23, 24

Claims 11, 16, 17, 20, 21, 23, and 24 recite a mounting bracket in combination

with a cupholder wherein a latching structure prevents or restricts removal of the

cupholder from the bracket.   The Court construed the phrase "prevent removal of the

cupholder in a second direction" to mean "the parts engage securely and can be separated

only by the use of a **special tool**."   *Caddy*, 2008 WL 927569 at *10 (emphasis added).

The Court concluded that such a specification was appropriate because removal of the

bracket from the cupholder in the Reissue patent without a "special tool" would cause

destruction of the bracket or the cupholder.   *Id.*   The parties now dispute the role or

definition of a "special tool" for the purposes of the claim construction.   ASC contends,

however, that even absent a description of the "special tool," it is undisputed that the

ASC cupholder can be detached from the bracket by using "common articles, or even by

hand."   (Def.'s Supp. Mem., Docket No. 148 at 22.)   As a result, ASC argues that its

product does not infringe Claim 11 of the Reissue Patent.

Caddy responds that the ASC cupholder cannot be removed by hand from the

adapter, and must be removed with a special tool, when it is "installed on a seat standard

in the ordinary course." (Pl.'s Opp. Mem., Docket No. 156, at 19.)  Caddy also argues that a "special tool" for the purposes of the Court's construction must have particular properties: it must be "a narrow, stiff shaft that can slide between, and resiliently bend, the walls so that the mating lugs and recesses disengage." (*Id.* at 21.)

In sum, ASC presents deposition testimony and evidence that the adapter can be removed with a finger.  Caddy presents evidence that the adapter can only be removed with a special tool and also that ASC's demonstration removing the adapter by hand was fallible because it was performed on a faulty cupholder.  Whether the ASC container holder is removable from the adapter by a special tool is a question of fact, and the evidence produced by the parties demonstrates a dispute on this issue.  Accordingly, ASC's motion for summary judgment of non-infringement is denied.

### 3.   Infringement of Claim 17

ASC argues that Claim 17 is not infringed on the additional basis that it does not have a pair of side shield walls.  As previously discussed in Section III.A.1.b, ASC's motion for summary judgment of non-infringement as it relates to side shield walls is granted.

### 4.   Infringement of Claim 20

ASC also contends that Claim 20 is not infringed for the additional reason that the ASC container holder does not obscure at least one fastener opening.  For the reasons discussed in Section III.A.1.b, ASC's motion for summary judgment of non-infringement as it relates to obscuring the fastener openings is granted.

**B.     Validity of the Reissue Patent**

1.     **ASC's motion for summary judgment**

ASC submits that if its cupholder is found to infringe any claim of the Reissue patent, then such claim is invalid over the prior art.  In particular, ASC argues that the scope of three prior art patents yield the conclusion that the Reissue patent is obvious: (1) U.S. Pat. No. 5,813,644 ("Bergin") directed to a container holder with a separable support; (2) U.S. Pat. No. 1,794,700 ("McCaskey") directed to a receptacle, such as a soap dish, that can be attached to a holder or retainer; and (3) U.S. Pat. No. 1,252,207 ("Walker") directed to a bathroom fixture.  Further, ASC evaluates the scope and content of the prior art to show that the background section of the '392 identifies a problem known in the art regarding the Bergin patent and that the McCaskey and Walker patents teach solutions to the known problem.  ASC also points to the expert opinion of Dr. Mantell to support its argument that the Reissue patent is obvious.

Caddy responds by arguing that McCaskey and Walker teach inapposite attachment methods, such as the use of brackets and headers, instead of the latching mechanism used by Caddy.  Caddy also notes that Bergin was considered by the patent examiner during prosecution.

The substance of the dispute between Caddy and ASC – the scope and content of the cited prior art patents and the difference between those patents and the Reissue patent – is a factual dispute based on the *Graham* factors and, as such, precludes entry of summary judgment for either party.

## 2.     Caddy's motion regarding alleged co-inventor Michael Tadych

Caddy also seeks a ruling that ASC may not argue that the Reissue patent is invalid for failure to name an alleged co-inventor, Michael Tadych.[10]  A person is not entitled to a patent if "he did not himself invent the subject matter sought to be patented." 35 U.S.C. § 102(f).   When an invention is the work of collaborating inventors, "[o]mission of an inventor can invalidate a patent unless the omission was an error without any deceptive intention."  *Acromed Corp. v. Sofamor Danek Group, Inc.*, 253 F.3d 1371, 1379 (Fed. Cir. 2001) (internal quotation marks omitted).   Under the statutory presumption of validity, "each patent also receives the presumption that its named inventors are the true and only inventors."  *Id.*   "In order to rebut this presumption, a party challenging patent validity for omission of an inventor must present clear and convincing evidence that the omitted individual actually invented the claimed invention." *Id.* (citing *Environ. Prods. v. Furon Co.*, 215 F.3d 1261, 1265 (Fed. Cir. 2000)).

The Federal Circuit adopted a "rule of reason," which requires a co-inventor to provide corroborating evidence of his or her contributions toward the conception of an invention.  *Checkpoint Sys., Inc. v. All-Tag Security, S.A.*, 412 F.3d 1331, 1339 (Fed. Cir. 2005).   "Physical, documentary, or circumstantial evidence, or reliable testimony from individuals other than the alleged inventor or an interested party, may corroborate."  *Id.*

---

[10]   Caddy's initial briefing raised Tadych's alleged inventorship as an issue for both the '638 and the '392 patents.  (Pl.'s Supp. Memo., Docket No. 145 at 16.)  Subsequent briefing and oral arguments by both parties, however, clarifies that Tadych's alleged inventorship is only disputed with respect to the '392 patent.  ASC agrees that the record presents no evidence indicating that Tadych contributed to the conception of the '638 patent.  (Def.'s Opp. Memo, Docket No. 159 at 12 n.1.)

Tadych was a tool designer and engineering manager at Meehan Tool, a company that was involved in some levels of product development with Caddy.  (Tadych Depo. 7:7-7:8, Docket No. 159, Ex. C.)  Tadych testified at his deposition that he "invented" or "created" the bracket design for the Reissue patent.  (*Id.* 63:12 – 64:24)

ASC claims that there is sufficient contemporaneous corroborating evidence to establish a genuine issue of material fact as to whether Tadych is an original inventor of the Reissue patent.  In particular, ASC produces a faxed memo by Tadych to Peter Bergin (the named inventor of the Reissue patent) with Computer Aided Design (CAD) drawings of the Reissue-patented product.  (Def.'s Opp. Mem., Docket No. 159 at 15-17.)  Tadych claimed in his deposition that this memo is evidence of the initial design of "his" invention.  This evidence is lacking under *Checkpoint*.  Although circumstantial evidence of contributions to the conception of the Reissue patent is admissible, *testimony* by the alleged co-inventor providing the context for that evidence is not.  *See Checkpoint*, 412 F.3d at 1339.  The faxed memo, on the other hand, is not sufficiently probative to establish a factual dispute, particularly without some admissible context to describe its purpose or effect.

ASC also relies on Bergin's testimony, which references "initial designs" drawn by Tadych for the Reissue-patented product.  Bergin's testimony indicates that the design in the Reissue patent may have been initiated in response to the development of a new stadium chair.  However, the mere fact that a new stadium chair was being developed, and that Bergin, in conjunction with Meehan Tools and Tadych, was developing a cupholder solution for that chair, fails to raise a material fact as to conception.  That is,

Tadych's mere assistance does not amount to inventorship.  *See Hobbs v. Atomic Energy Comm'n*, 451 F.2d 849, 864 (5th Cir. 1971) ("It is clear . . . that an inventor may use the services, ideas, and aid of others in the process of perfecting his invention without losing his right to a patent.").  Even viewed in the light most favorable to the non-moving party, the evidence does not suggest that Tadych contributed to the conception of the invention, but only indicates that Tadych assisted the inventor of the product covered by the Reissue Patent.[11]

ASC fails to raise a genuine issue of material fact as Tadych's contribution to the Reissue patent.  Accordingly, Caddy's motion for summary judgment as to Tadych's role as a co-inventor is granted.

## IV.    REQUESTS FOR LEAVE TO SUPPLEMENT THE RECORD

At the hearing, Caddy requested leave to supplement the record with additional expert reports obtained in connection with this matter.  ASC objected to this request, and filed a letter with the Court seeking, in the alternative, the opportunity to also supplement the record with additional testimony from alleged co-inventor Michael Tadych.  These requests are denied.

This case will be placed on the Court's next available trial calendar.

---

[11] In a letter to the Court regarding Caddy's request for leave to supplement the record with additional expert opinions, ASC requests leave to supplement the record with additional testimony from Tadych regarding his position as an inventor or co-inventor.  Regardless of the Court's disposition on the permissibility of supplementing the record, Tadych's additional deposition testimony would not influence the Court's decision on Caddy's motion for summary judgment.  Indeed, ASC seeks only to produce additional evidence by the alleged co-inventor, which is not admissible by *Checkpoint*.

## ORDER

Based on the foregoing, all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that

1.      Plaintiff Caddy Products, Inc.'s Motion for Summary Judgment [Docket No. 143] is **GRANTED IN PART** and **DENIED IN PART** as follows:

        a.      The motion is **GRANTED** to the extent that ASC may not argue invalidity of the Reissue patent for failure to name a proper co-inventor**.**

        b.      The motion is **DENIED** in all other aspects.

2.      Defendant American Seating Company's Motion for Summary Judgment [Docket No. 147] is **GRANTED IN PART** and **DENIED IN PART** as follows:

        a.      The motion is **GRANTED** on non-infringement of the Reissue Patent's Claim 15 limitation of a pair of spaced side shield walls; Claim 17 limitation of a pair of spaced side shield walls; and Claim 20 limitation of an obscured fastener opening.

        b.      The motion is **DENIED** in all other respects.

3.      Plaintiff Caddy Products, Inc.'s request for leave to supplement the record for the purposes of these motions is **DENIED AS MOOT.**

4.      Defendant American Seating Company's request for leave to supplement the record for the purposes of these motions is **DENIED AS MOOT.**


DATED:  March 24, 2009                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                        JOHN R. TUNHEIM
                                            United States District Judge